## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE GREEN FIELD ENERGY SERVICES, INC., *et al.*, | : : : | Chapter 11<br>Bankr. No. 13-12783-KG<br>(Jointly Administered) |
| Debtors. | : : | |
| _____ | : : | |
| ALAN HALPERIN, AS TRUSTEE OF THE GREEN FIELD LIQUIDATION TRUST, | : : : : | Adv. No. 15-50262-KG |
| Plaintiff,<br>v. | : : : | |
| MICHEL B. MORENO, *et al.*, | : : : | Civ. No. 18-1881-CFC |
| Defendants. | : | |

---

Robert J. Stark, Marek P. Krzyowski, BROWN RUDNICK LLP, New York, New York; James W. Stoll, Melanie Dahl Burke, Brian M. Alosco, BROWN RUDNICK LLP, Boston, Massachusetts; Joel S. Miliband, BROWN RUDNICK LLP, Irvine, California; Steven K. Kortanek, Patrick A. Jackson, Joseph N. Argentina, Jr., DRINKER BIDDLE & REATH LLP, Wilmington, Delaware,

     *Counsel for Plaintiff*

Jeffrey R. Fine, Alison R. Ashmore, Aaron Kaufman, R. Chris Harvey, DYKEMA GOSSETT PLLC, Dallas, Texas; Marc J. Phillips, MANNING GROSS + MASSENBURG, Wilmington, Delaware,

     *Counsel for Defendants*

## **MEMORANDUM OPINION**

October 16, 2019
Wilmington, Delaware

## I.    INTRODUCTION

Pending before the Court is the Bankruptcy Court's *Opinion and Findings of Fact and Conclusions of Law*, dated September 12, 2018 (Adv. D.I. 535)[1] [APP 0002-0127] ("FFCL") and Order, dated September 18, 2018 (Adv. D.I. 540) ("Order"), which together recommend that this Court enter judgment against defendants Michel B. Morena ("Morena") and MOR MGH Holdings, LLC ("MOR MGH")[2] and in favor of plaintiff ("Trustee") on certain Counts of the Complaint in the above-referenced adversary proceeding ("Adversary Proceeding"). The FFCL constitutes the Bankruptcy Court's proposed findings of fact and conclusions of law in support of final judgment, as required by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7052 and 9033.[3] Defendants Moreno and MOR

_____

[1] The docket of the Adversary Proceeding, captioned *Halperin v. Moreno, et al.*, Adv. No. 15-50262 (KG) (Bankr. D. Del.), is cited herein as "Adv. D.I. __." Citations to "APP" refer to the Appendix filed in support of Defendants' Objection to the FFCL (Adv. D.I. 554), which was supplemented by the Trustee in the Supplemental Appendix filed in support of Trustee's Response to the Objection (Adv. D.I. 564). Citations to APP 0001-2152 are contained in the Appendix, and citations to APP 2153-2492 are contained in the Supplemental Appendix.

[2] Defendants in the Adversary Proceeding include: Michel B. Morena; MOR MGH Holdings, LLC; FRAC Rentals, LLC; Turbine Generation Services, LLC; Aerodynamic, LLC; and Casafin II, LLC.

[3] The FFCL constituted the Bankruptcy Court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052. Bankruptcy Rule 9033 provides that, in any proceeding in which the Bankruptcy Court has issued proposed findings of fact

MGH have filed a limited objection with respect to certain of the proposed FFCL (Adv. D.I. 550) ("Objection") together with a suggestion in support of the Objection (Adv. D.I. 552) ("Suggestion"). Defendants object to the Bankruptcy Court's FFCL only as to Counts 11, 12, and 14.[4] For the reasons set forth herein, the Court sustains Defendants' objection to the Bankruptcy Court's factual finding that the $10 million Moreno diverted to his personal use was "earmarked" for Green Field, overrules Defendants' remaining Objections, and adopts the Bankruptcy Court's proposed FFCL.

## II. BACKGROUND[5]

This dispute arises in the chapter 11 bankruptcy cases of Green Field Energy Services ("Green Field") and certain of its affiliates (collectively with Green Field, "Debtors"), which were commenced on October 27, 2013. The Trustee commenced the Adversary Proceeding on April 6, 2015, asserting claims against

---

and conclusions of law, this Court shall review *de novo* "any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made . . . " FED. R. BANKR. P. 9033.

[4] The parties disputed whether Counts 11 and 12 were "core" or "non-core" claims but agreed that Count 14 was a "non-core." [APP 0187]. The FFCL found that Counts 11, 12, and 14 were all "non-core" claims for which the Bankruptcy Court could enter proposed findings of fact and conclusions of law to be submitted to this Court.

[5] A thorough summary of the events leading to this dispute is contained in the Bankruptcy Court's detailed findings of facts and will not be repeated here. (FFCL 1-84). The Court writes for the benefit of the parties and thus presumes familiarity with these facts.

various defendants including Moreno, MOR MGH, and Turbine Generation Services, LLC ("TGS").[6] The Complaint originally pleaded 35 counts, but certain counts were settled or withdrawn. (FFCL 3-5). The issues presented for trial included:

> Counts 1, 2, 3, 6, and 7 – Fraudulent transfer, breach of fiduciary duty and corporate waste claims against Moreno and TGS related to the alleged transfer or waiver of the power generation business by Moreno to himself, personally, through TGS.

> Counts 11, 12, and 14 – Breach of contract, breach of fiduciary duty, and tortious interference claims against MOR MGH and Moreno related to MOR MGH's alleged breaches of the SPAs (defined below) that required MOR MGH to purchase preferred stock in Green Field, and Moreno's interference with MOR MGH's obligations under those contracts.

Moreno became the Chairman of the Board of Directors and CEO of Green Field in October 2011 and remained Chairman and CEO until the company's liquidation. The relationships between certain entities that were either owned by Defendant Moreno or otherwise related to Green Field are relevant to the Bankruptcy Court's findings with respect to the breach of contract and tortious interference claims, and the Court summarizes them as follows, based on findings in the FFCL as to which there is no dispute:

> *MOR MGH.* In 2011, Moreno and his wife formed two

---

[6] Adv. D.I. 209 (*Second Amended Complaint and Objection to Claims Pursuant to Bankruptcy Code Sections 502 and 503 and Federal Rule of Bankruptcy Procedures 3007*).

Grantor Retained Annuity Trusts ("GRATs") called the MBM 2011 MGH Grantor Retained Annuity Trust and the TCM 2011 MGH Grantor Retained Annuity Trust (collectively, the "MGH GRATs"). (FFCL 17) [APP 0018]. Moreno was responsible for managing the assets and investments of the MGH GRATs. (FFCL 114) [APP 0115]. The sole asset of each MGH GRAT was an equal share of MOR MGH. (FFCL 17) [APP 0018]. MOR MGH was established as a special purpose limited liability company registered in the state of Delaware. (*Id.*) Its sole asset was stock in Green Field. (*Id.*) During the relevant time frame, MOR MGH owned 88.9% of Green Field common stock. (*Id.*) Moreno was the manager of MOR MGH. (FFCL 114) [APP 0115]. Moreno acknowledged that whatever money MOR MGH had in its possession was derived from money he borrowed. (FFCL 112) [APP 0113].

*Moody Moreno and Rucks, LLC ("MMR").* MMR was the other Green Field shareholder, along with MOR MGH. (FFCL 19) [APP 0020]. At all relevant times, MMR owned 11.1% of Green Field common stock. (*Id.*) MMR was equally owned by TMC Investment, L.L.C., Elle Investments, L.L.C., and Rucks Family Limited Partnership. (*Id.*) Elle Investments, L.L.C. was owned and controlled by Moreno. (Trial Tr. 96:9-97:5) [APP 0952].

*MOR DOH Holdings ("MOR DOH").* Similar to the MGH GRATs, Moreno and his wife formed two additional GRATs called the MBM 2011 DOH Grantor Retained Annuity Trust and the TCM 2011 DOH Grantor Retained Annuity Trust (collectively, the "DOH GRATs"). (FFCL 18) [APP 0019]. The sole asset of each DOH GRAT was an equal share of MOR DOH. (*Id.*) (citing Trial Tr. 68 [APP 0946]). MOR DOH eventually came to own three different entities, including TGS. (*Id.*)

*TGS.* TGS was a subsidiary of MOR DOH formed by Moreno in March 2013. (FFCL 21) [APP 0022]. Moreno formed it as a "place-holder" for a joint venture with

General Electric ("GE") outside of Green Field. (FFCL 21-22) [APP 0022-0023]. TGS was at all times a corporate shell with no employees, no capital, and no infrastructure. (Trial Tr. 293:15-20) [APP 1001]. Moreno conceded that TGS was established for the sole purpose of holding a PowerGen[7] business and opportunity. (*Id*. 843:7-18) [APP 1321].

The trial involved two conceptually separate sets of claims against Moreno and entities he controlled arising from two discrete, yet parallel factual patterns. The first factual pattern involved the transfer by Green Field to Moreno of PowerGen, a power generation business venture. Green Field was primarily a fracking company, but upon a downturn in the market, Moreno began to explore other potential business ventures, like PowerGen. Ultimately, Moreno decided not to pursue the PowerGen business within Green Field, but rather formed TGS to pursue that opportunity. To effectuate the transfer of the PowerGen business to TGS, Moreno and the other directors of Green Field executed a May 13, 2013 Written Consent of the Stockholders and Directors of Green Field. As a result of the Written Consent, Green Field could not pursue the PowerGen business. After the consent was executed, Moreno focused his

---

[7] Debtor's manufacturing subsidiary, Turbine Power Technologies, LLC ("TPT"), used technology – developed, owned, and adapted by Ted McIntyre – to manufacture turbine powered fracturing pumps ("TFPs"), which Debtor used pursuant to an exclusive license agreement between TPT and Debtor. "PowerGen" refers to a prospective business of manufacturing and/or leasing turbine power generator units ("TPUs") powered by aero derivative turbine engines. The technology used to develop, adapt, and manufacture the TPUs was also owned by Ted McIntyre. (FFCL at 4-5 n.4).

own efforts on PowerGen.

Running parallel with these events are the facts involving two share purchase agreements ("SPAs"). In these agreements, Moreno promised that MOR MGH and MMR would purchase certain amounts of Green Field preferred stock. The first agreement, executed in late 2012, required, among other things, that MOR MGH and MMR purchase on a quarterly basis enough preferred stock to keep Green Field's cash balance at $10 million. Although MOR MGH and MMR initially complied with their obligations under the 2012 SPA, once Moreno decided to focus his efforts on PowerGen instead of Green Field's fracking business, they stopped their purchases of Green Field preferred stock.

In the second agreement, executed in June 2013, Goldman Sachs ("Goldman") required MOR MGH to purchase $10 million in additional Green Field preferred stock, which in turn would be pledged to Goldman as partial security for a loan Goldman had extended to Moreno ostensibly to develop PowerGen.

Prior to trial, the Bankruptcy Court granted summary judgment against MOR MGH for breach of the SPAs based on MOR MGH's failure to make payments in accordance with each contract's terms. (Adv. D.I. 463).[8] The

---

[8] The Bankruptcy Court also decided in its summary judgment opinion that New York law applies to the Trustee's contract-related claims, including breach of contract and tortious interference. (Adv. D.I. 463 at 36, 41).

Bankruptcy Court also ruled that, with respect to damages, the Trustee had the burden of proving not only the amount of the non-payments but also that Green Field would have been in a better "economic position" had MOR MGH fully performed its obligations under the SPAs. (*Id.* at 40-10) [APP 2097-2098]. Although the Trustee disagreed with the Bankruptcy Court's ruling as to the burden of proof on damages, the Trustee proceeded at trial to establish that Green Field had incurred damages different and distinct from MOR MGH's failure to make its required payments.

On September 12, 2018, the Bankruptcy Court issued the proposed FFCL. (Adv. D.I. 535) [APP 0002-0127]. The Bankruptcy Court found that Moreno had tortiously interfered with MOR MGH's contractual obligations because he wrongfully diverted monies intended for Green Field to purchase his personal home in Dallas, Texas, and otherwise put his own personal interests before those of MOR MGH. The Bankruptcy Court also found that Moreno interfered with the obligations of MMR, the other Green Field shareholder, under the 2012 SPA. The Court imposed a constructive trust over Moreno's residence based on his diversion of the $10 million to buy his home. Finally, the Bankruptcy Court revisited its prior ruling as to the burden of proof on damages and concluded that it had improperly required Green Field to prove damages beyond the non-payments required under each agreement and that the evidence supported the conclusion that

Green Field had in fact been damaged by the non-payments.[9]

As to the separate and discrete PowerGen-related claims (i.e., actual and constructive fraudulent transfer, breach of fiduciary duty, and corporate waste), the Bankruptcy Court ruled in Defendants' favor. Although there were certain intersections of facts between the two sets of claims, the PowerGen-related tort claims and the SPA-related contract claims are legally distinct with different relevant factual predicates. Defendants' Objection to the proposed FFCL is with respect to the SPA-related claims only, as Defendants prevailed on the PowerGen-related claims.

On September 18, 2018, the Bankruptcy Court issued the Order, recommending that this Court adopt its FFCL and enter judgment in favor of the Trustee on Counts 11, 12, and 14. Specifically, the Bankruptcy Court recommends that the Court enter judgment on Counts 11 and 12 in favor of the Trustee and against MOR MGH in the amount of $15,961,923, plus applicable prejudgment

---

[9] The Bankruptcy Court observed additional evidence supporting the more general premise that "Green Field would have been in a better economic position had MOR MGH complied with its SPA obligations." (FFCL 111) [APP 0112]. Specifically, the Bankruptcy Court observed that the breaches of the SPAs caused Green Field to miss its interest payments due to Shell, which triggered cross-defaults under the Shell Contract and Bond Indenture and, ultimately, to Green Field filing for bankruptcy. *Id.* Moreno admitted that had the SPAs been fulfilled, Green Field would have been able to make the required interest payments. *Id.* (citing Trial Tr. 469:20-470:3 [APP 1135]).

interest, and on Count 14 in favor of the Trustee and against Moreno, personally, in the amount of $16,607,081, plus applicable prejudgment interest. The Bankruptcy Court also recommended that this Court impose a constructive trust on Moreno's Dallas residence in favor of the Trustee in the amount of $10 million, plus applicable prejudgment interest, as a result of the Trustee's recommended success on his tortious interference claim against Moreno.

The Court has considered Defendants' Objection and Suggestions, Trustee's Response (Adv. D.I. 562, 564), Defendants' Reply (Adv. D.I. 567), and Trustee's Sur-Reply (Adv. D.I. 568, Ex. A).[10] The proposed FFCL are now properly before this Court to render final judgment. The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. For the reasons set forth below, the Court sustains Defendants' objection to the Bankruptcy Court's factual finding that the $10 million Moreno diverted to his personal use was "earmarked" for Green Field, overrules Defendants' remaining Objections, and adopts the Bankruptcy Court's proposed FFCL.

---

[10] Although Bankruptcy Rule 9033 does not contemplate the filing of a reply, on November 20, 2018, the Bankruptcy Court entered an Order granting Defendants leave to have filed their Reply and also granting the Trustee leave to file its Sur-reply. (*See* Adv. D.I. 571).

## III. JURISDICTION AND STANDARDS OF REVIEW

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. Once a bankruptcy court determines that a pending matter is not a core proceeding under 28 U.S.C. § 157(b)(2) but is nonetheless related to a case under title 11, the court shall submit proposed findings of fact and conclusions of law to the district court. *See* 28 U.S.C. § 157(c)(1). Thereafter, "any final order or judgment shall be entered by the district court judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." *Id.* The Federal Rules of Bankruptcy Procedure provide that:

> The district judge shall make a *de novo* review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule. The district judge may accept, reject or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

FED. R. BANKR. P. 9033(d). "In conducting a *de novo* review, the Court must consider all of the Bankruptcy Court's findings and conclusions and afford them no presumption of validity." *In re Montgomery Ward & Co.*, 2004 WL 323095, at *1 (D. Del. Feb. 13, 2004), *rev'd on other grounds*, 428 F.3d 154 (3d Cir. 2005).

# IV. ANALYSIS

Defendants have identified five "specific objections based on the record" and five "objections to proposed conclusions of law regarding the constructive trust" recommended by the Bankruptcy Court. *See* Suggestion at i. The Court addresses these objections in turn.

## A. Proposed Findings of Fact

### Objection 1: That Moreno Orchestrated Green Field's Waiver of the PowerGen Business. FFCL 25; Suggestion at 7-8.

Defendants object to the Bankruptcy Court's finding that "Moreno orchestrated Green Field's waiver of the PowerGen Business in favor of himself personally."[11] (Suggestion, 7-8). Defendants contend that the finding characterizes Moreno's actions and dealings with GE as "an effort to harm Green Field or benefit himself." (Objection, 2). Defendants argue that this proposed finding contradicts what they refer to as the Bankruptcy Court's "more detailed reasoning" in other portions of the FFCL and argue the finding is not supported by the evidentiary record. (*Id.*) Specifically, Defendants cite the Bankruptcy Court's rulings that: Green Field never obtained a property interest in the PowerGen business or opportunity;[12] the creation of TGS and development of a PowerGen

---

[11] FFCL 25 [APP 0026].
[12] FFCL 89-93 [APP 0090-94].

business outside of Green Field was a mandate from GE;[13] "Moreno established TGS for legitimate business reasons aimed to support Green Field, not harm Green Field or create an unfair opportunity for Moreno;"[14] and that negotiations with GE led to a $25 million cash infusion into Green Field –consideration that "would not have been possible but for Moreno's continuous negotiations with GE and extensive efforts to find capital to save Green Field."[15] Additionally, Defendants assert that "the Bankruptcy Court's conclusions of law on the Trustee's breach of fiduciary duty claims detailed the reasons why Moreno's actions were consistent with his fiduciary duties, even under Delaware's highest standard of scrutiny."[16]

All of these arguments miss the mark. The finding to which Defendants object is relevant only to the SPA claims for the purpose of demonstrating that, as Defendants admit, following execution of the Written Consent on May 13, 2013, the PowerGen business was pursued "outside of Green Field." (Suggestion, 7; JX 61 [APP 0597-0599]). The express terms of the Written Consent provide that Green Field "waived" the opportunity to have an interest in PowerGen. (JX 61) [APP 0597]. While Moreno engaged in transactions in support of the PowerGen

---

[13] FFCL 21-22 [APP 0022-23] (citing JX 27 [APP 0437-0440]; JX 30 [APP 0441-43]; PX 136 [APP 0646-56]; PX 152 [APP 0681-84]; PX 157 [APP 0758-74]; Trial Tr. 291-95 [APP 1001-02]; 312:6-14 [APP 1006]; 588:4-7 [APP 1164]; 782:3-19 [APP 1306]; 785-87 [APP 1307]).
[14] FFCL 22 [APP 0023; 751].
[15] FFCL 38-50 [APP 0039-51].
[16] FFCL 98-108 [APP 0099-109].

business outside of Green Field (in which Green Field had no ownership interest), he neglected the obligations of MOR MGH under the SPAs. The fact that Green Field may have received some ancillary benefits from the pursuit of the PowerGen business in TGS is irrelevant to the SPA claims, which would have provided direct benefits to Green Field.

**Objection 2**: **That Moreno Caused MOR MGH's Breach of The SPAs.**
**FFCL 27; Suggestion at 8-12.**

Defendants object to the Bankruptcy Court's finding that Moreno caused MOR MGH to breach the SPAs. (Suggestion 8-12). The Bankruptcy Court found:

> Accordingly, Moreno had additional funds on hand that would have allowed him to permit MOR MGH to satisfy its obligations under the 2012 SPA or the 2013 SPA (discussed and defined below). Moreno conceded at trial that "[i]t would have been beneficial for Green Field to have every dollar it could find." Trial Tr. 469:17-19. He also acknowledged that the absence of cash "is absolutely the kiss of death" to a company. Trial Tr. 478:12-17. **Despite these acknowledgments, he chose to cause MOR MGH to fail to provide necessary cash to Green Field, even though he had funds on hand.**

(FFCL 27) [APP 0028] (emphasis added). The record amply supports this finding of causation. The parties stipulated that Moreno was the manager of MOR MGH. Stip. Facts ¶ 8 [APP 0200]; *see also* Trial Tr. 62:2-12 [APP 0945]; PX 92 at § 3.2 [APP 2187]. They further stipulated that MOR MGH was owned by two grantor retained annuity trusts, collectively referred to as the MGH GRATs, Stip. Facts ¶ 9

[APP 0200], and Moreno was responsible for managing the assets and investments

of the MGH GRATs, *see* Trial Tr. 67:17-20, 75:13-76:2 [APP 0946, 0948].

Additionally, Moreno acknowledged that whatever money MOR MGH had in its

possession was derived from money he borrowed.[17] (FFCL 112) [APP 0113]. The

Bankruptcy Court also noted that Moreno testified at trial that he referred

interchangeably to MOR MGH's obligations under the SPAs as his own and those

of MOR MGH. (FFCL 115 n. 20) [APP 0116]. These findings support the

conclusion that Moreno was responsible for MOR MGH's breaches: as MOR

MGH's lone-decision maker, Moreno directed and caused MOR MGH's breach of

its contractual obligations.

To the extent that Defendants raise this Objection to challenge the

Bankruptcy Court's finding that Moreno was acting with self-interest in causing

the breaches of the SPAs, the Court agrees with Trustee that such an argument is

unavailing. Under applicable New York law, an officer of a company can be held

liable for tortious interference with the company's contract if he or she is acting for

his or her own personal gain. *See Rockland Exposition, Inc. v. Alliance of Auto.

Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 336-37 (S.D.N.Y. 2012); *Hoag v.*

---

[17] *See* Trial Tr. 846:23-847:8 [APP 1322]. For example, the record reflects that
Moreno made several loans to MOR MGH and pledged those notes as security for
funds from Goldman. (Trial Tr. 847:22-850:12 [APP 1322-1323]; Trial Tr. Conf.
3/22 1:10-4:16 [APP 1254]; PX 156 [APP 0727].

*Chancellor, Inc.*, 677 N.Y.S.2d 531, 533-34 (N.Y. App. Div. 1998); *Petkanas v. Kooyman*, 759 N.Y.S.2d 1, 2 (N.Y. App. Div. 2003); *Zuckerwise v. Sorceron Inc.*, 735 N.Y.S.2d 100, 102 (N.Y. App. Div. 2001). The Bankruptcy Court found that Moreno acted in his own self-interest to the detriment of Green Field in causing both MOR MGH and MMR to breach the SPAs. (FFCL 114-123) [APP 0115-0124]. Here, Moreno is asking the Court to ignore actions taken in connection with the SPAs and focus instead on his efforts to launch PowerGen outside of Green Field, which efforts, he maintains, resulted in ancillary benefit to Green Field. However, any ancillary benefit does not prove that Moreno was not putting his personal interests first when he caused MOR MGH to breach the SPAs. Rather, the record supports the finding that Moreno's actions with respect to the SPAs demonstrate that he was acting in his own personal interest, notwithstanding any ancillary benefits Green Field received from the PowerGen business. (FFCL 114-20) [APP 0115-0121]. Moreno's focus on trying to develop PowerGen after he caused Green Field to waive its ability to pursue that opportunity was, by his own admission, the very reason he stopped performing under the SPAs. (PX 177 at 5) [APP 0883] ("Finally, one of the defaults that obviously occurred in the quarter, there was a $6 million Equity commitment that I was personally going to have to fulfill in the quarter. That didn't happen, obviously it didn't happen for a couple of reasons that I'll share with you guys. One, obviously is that I've been

funding a large part of the start-up expenses personally on PowerGen . . . so a lot of my personal capital has gone to that.").

As to Defendants' other arguments, the Court is not persuaded that the Bankruptcy Court's finding that Moreno decided not to honor the SPAs is in conflict with its finding that Moreno searched for investors relating to the PowerGen business. (Suggestion, 10). This argument conflates the completely distinct PowerGen claims and the SPA claims. Nor is the Court persuaded by Defendants' contention that Moreno was not required to use funds he borrowed to satisfy MOR MGH's obligations under the SPAs. (Suggestion, 9-10). As discussed *infra*, the record supports the finding that $10 million of the Goldman loan was intended for use by MOR MGH to satisfy the 2013 SPA. Additionally, this is irrelevant with respect to Moreno's malicious intent. The record establishes that Moreno set up MOR MGH as a shell company with no liquid assets, its only asset being Green Field stock.[18] As such, Moreno knew the only way MOR MGH could ever satisfy the SPAs was if he funded it, which he did repeatedly.[19] By later declining to provide MOR MGH the funds it needed to purchase Green Field preferred stock as required by the SPAs, and instead using the money for his own personal benefit, Moreno intentionally interfered with MOR MGH's obligations.

---

[18] FFCL 17 [APP 0018]; *see also* Trial Tr. 847:9-21 [APP 1322].
[19] *See* Trial Tr. 847:22-850:12 [APP 1322-1323]; Trial Tr. Conf. 3/22 1:10-4:16 [APP 1254]; PX 156 [APP 0727].

As Trustee correctly argues, the fact that some borrowed funds were intended to fund TGS is also irrelevant. While the record supports a finding that Moreno did use $48 million of his borrowings to fund TGS, Green Field owned no part of TGS. Moreno owned TGS through his limited liability company MOR DOH. (FFCL 18-19) [APP 0019-0020]. Putting resources into a company he owned to the exclusion of Green Field in no way absolved MOR MGH of its obligations under the SPAs. Additionally, the Bankruptcy Court found that in addition to the $48 million, Moreno spent $10 million on buying a home and had another $27 million that was unaccounted for. (FFCL 111-12) [APP 0112-0113]. These are funds that could and should have been used to satisfy the SPAs.

Finally, Defendants object to the Bankruptcy Court's causation finding on the basis that Green Field did not need additional cash from the SPAs, arguing that it was Shell's decision to reduce its business with Green Field[20] that caused MOR

---

[20] Within months of entering into the market, Green Field entered into a "Contract for High Pressure Fracturing Services" (the "Shell Contract") with SWEPI, LP, the successor to Shell Western Exploration and Production, Inc. (collectively with its affiliates and subsidiaries, "Shell"). At all relevant times, Shell remained Green Field's most significant customer, representing up to 79% of all its revenues. *Id.* The Shell Contract committed $600 million in future revenue to Green Field, which became part of Green Field's business plan. (Trial Tr. 542-43). Shell also agreed to provide up to an aggregate amount of $100 million in senior secured term loans to Green Field. (FFCL 13-15) [APP 0014-0016]. In May 2012, Green Field needed additional funds, and Shell agreed to amend the loan to provide additional funding, but it required, among other things, interest-only payments of $2 million per month until November 2013 (at which point they would increase to $4 million and then to $7.5 million in May 2014). Green Field defaulted on those

MGH to breach its contractual obligations to Green Field. (Suggestion, 11-12).

The Court agrees with Trustee that the Bankruptcy Court's holding with respect to damages obviates a showing of what Green Field would have done with the money once it received it; the nonpayment itself was sufficient to show damages. Additionally, an inquiry into what Green Field would have done with the funds after receiving them is inappropriate under New York law. *See e.g., Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) ("[E]vents subsequent to the breach, viewed in hindsight, may neither offset nor enhance [a party's] general damages."). Thus, Defendants' hypothetical statement that Green Field would not have made the interest payment to Shell even if it had the cash on hand is not persuasive.

**Objection 3**: **That Green Field Suffered $15,961,923 in Damages. FFCL 113; Suggestion at 12-17.**

Defendants argue that the Bankruptcy Court's findings relating to contractual damages must also be rejected, because the evidentiary record does not support its calculation. (Suggestion, 12-17). The Bankruptcy Court found that Green Field suffered $15,961,923 in damages due to the MGH MGH's failure to

_____

payments in June, July, and August 2013. Moreno testified (and the Trustee made no effort to controvert) that Shell notified Moreno and Green Field's management in June of 2013 that Shell would not fulfill its future revenue commitment. (Trial Tr. 424:21-431:20) [APP-1128-29].

18

purchase stock under the 2012 and 2013 SPAs. (FFCL 113) [APP 0114].

Defendants assert that the only evidence supporting this conclusion is Green Field's failure to pay $6 million in interest payments to Shell – Green Field's most significant customer – in June, July, and August, which the FFCL found to be the reason for "cross defaults under the Shell Contract and the Bond Indenture." (FFCL 111) [APP 0112].

Defendants assert that this conclusion cannot be reconciled with the Bankruptcy Court's other findings that Green Field benefitted from $50 million in cash infusions from TGS. (FFCL 104-08) [APP 105-09]. Defendants rely on the Bankruptcy Court's findings in connection with the PowerGen business, including that Moreno established TGS for legitimate business reasons, and that Moreno's efforts and months of negotiations with GE to obtain the $25 million in GE loan proceeds, which Moreno personally guaranteed, generated liquidity for Green Field. (Trial Tr. 121:20-213:12) [APP 0958-81]; (FFCL 35, 38-50) [APP 0036, 0039-0051]. Defendants cite the Bankruptcy Court's finding that Moreno, personally, DOH Holdings, and the DOH GRATs all borrowed funds from Powermeister and Goldman without causing Green Field to become obligated for any of that debt. (FFCL 104) [APP 0105]. Defendants argue that while the Bankruptcy Court found that none of the Goldman loan proceeds were transferred to Green Field, it found that nearly $50 million in loan proceeds from other

lenders, which resulted from Moreno's efforts to arrange for new sources of liquidity, did make it to Green Field. Thus, Defendants argue, the Bankruptcy Court's damages finding conflicts with basic principles of math and is inconsistent with the extensive evidentiary record. Additionally, because the Bankruptcy Court found that evidence of Moreno's efforts were to be taken into account as mitigation of damages with respect to the PowerGen claims, Defendants argue that the Court should also accept this evidence as mitigation of damages for the SPA-related claims. Finally, Defendants argue that even if this Court were to conclude that this evidence was considered, the Bankruptcy Court's findings of a $6 million payment default to Shell does not support a finding of nearly $15.9 million in contractual damages.

According to Trustee, the Court must reject Defendants' argument that the Bankruptcy Court erred in its calculation that Green Field was damaged in the exact amount of the *unmade payments* under the SPAs. Trustee urges the Court to accept the calculation based on the Bankruptcy Court's well-reasoned findings. (Response, 32-37). The Trustee notes the importance of the procedural history on this finding. Before the trial, the Trustee moved for partial summary on his breach of contract and tortious interference claims. [APP 2404-2483]. The Bankruptcy Court found that the SPAs had been breached, but it deferred on the issue of damages until trial. The Bankruptcy Court imposed on the Trustee the burden to

prove that Green Field would have been in a better "economic position" had MOR

MGH fully performed. [APP 2097-2098]. On a Motion for Reconsideration, the

Trustee argued that he had, in fact, satisfied the burden of proof by demonstrating

the nonpayment of monies owed under a contract, citing extensive New York case

law on the issue. [APP 2484-2494; 2495-2499]. The Bankruptcy Court declined

to enter judgment in absence of a trial record. [APP 2450-2453]. In its FFCL

following trial, the Bankruptcy Court agreed with the Trustee's position. It held:

"The Court now holds that the Trustee has met his burden of proof of damages by

establishing non-payment of the amounts owed under the 2012 and 2013 SPAs."

(FFCL 110-11 [APP 0111-0112] (citing *House of Diamonds v. Borgioni, LLC*, 737

F. Supp. 2d 162, 172 (S.D.N.Y. 2010); *Stokoe v. E-Lionheart, LLC*, 129 A.D.3d at

703, 704 (N.Y. App. Div. 2015); *Bi-Economy Market, Inc. v. Harleysville Ins. Co.

of N.Y.,* 10 N.Y. 3d 187, 193 (N.Y. 2008)). Thus, the damages to Green Field are

simply calculated by the amounts owed under the SPAs that remained unpaid, and

the undisputed evidence, Trustee asserts, demonstrates that MOR MGH failed to

purchase $15,961,923 and MMR failed to purchase $745,158 of Green Field

preferred stock pursuant to the SPAs. (FFCL 113, 120) (APP 0114-0121).

The Court agrees that Defendants ignore this critical holding and have not

objected to it. Satisfaction of the Shell interest payment obligations is but one of

many uses to which Green Field could have put the cash it would have received

21

had MOR MGH complied with its contractual obligations; however, based on the Bankruptcy Court's correct application of applicable New York law, what Green Field would or would not have done with the funds is irrelevant. The Court also rejects the argument that the damages caused by breaches of the SPAs cannot be reconciled with the fact that "Green Field benefited from $50 million in cash infusions from TGS" and "Moreno established TGS for legitimate business reasons." (Suggestion, 12-13). Moreno's efforts with respect to PowerGen are irrelevant to his deprivation of funds to Green Field and its business by causing the breaches of the SPAs. The Bankruptcy Court considered that some of the money Moreno borrowed ended up being used for the direct benefit of TGS and the PowerGen business, which, in turn had ancillary benefits to Green Field, but found that this did not excuse MOR MGH's performance under the SPAs and that Moreno had additional funds on hand that should have been used to satisfy the SPA obligations. (FFCL 111-12) [APP 0112-0113]. The fact that some of Moreno's borrowings were ultimately channeled through Green Field in furtherance of the PowerGen business does not negate the fact that Green Field was otherwise damaged by MOR MGH's breaches of the SPAs. These findings are entirely consistent.

With respect to mitigation, Trustee argues that Defendants offer no legal support for their proposition that "[b]ecause the Bankruptcy Court's [FFCL]

accepted this evidence as mitigation of damages under breach of fiduciary duty, corporate waste, and fraudulent transfer claims, this Court must also accept the same evidence as mitigation of potential damages for the SPA-related claims," and the Court may dismiss the argument on that basis alone. *See Messer v. Peykar Intern. Co., Inc.*, 510 B.R. 31, 39 (S.D.N.Y. 2014) ("Bare statements that are . . . unsupported by legal authority, are not sufficient to constitute actionable objections.") The Court agrees. Moreover, the Trustee's breach of fiduciary duty, corporate waste, and fraudulent transfer claims all related to the transfer of the PowerGen business. The transactions through which Moreno invested approximately $50 million into TGS, including the sale of turbines, were also in connection with his attempt to develop the PowerGen business. Those transactions had nothing to do with MOR MGH's contractual requirement to purchase Green Field stock under the SPAs, and the Court rejects Defendants' argument that these transactions mitigate a failure to comply with contractual obligations under separate contracts between different parties.

**Objection 4: That Green Field Was Transitioning Into The Power Generation Business in or around February 2013. FFCL 25; Suggestion at 17-18.**

Defendants object to what they characterize as a "less material" proposed finding: "On February 13, 2013, while Green Field[] was transitioning into the

power generation market and negotiating with GE, the payment for the fourth quarter of 2012 became due." (FFCL 25) [APP 0026]. According to Defendants, this statement implies that Green Field was ceasing its core well servicing business and pivoting toward the power generation market. Defendants object on the basis that this assertion was never proven by the Trustee. According to Defendants, the two citations to the record in support of this finding (PX 132 [APP 0644-45] and Trial Tr. 381:3-382:20 [APP 1117]) are incorrect citations, as they do not support any transition into the power generation market, and the uncontroverted evidence presented at trial demonstrated that Green Field never pivoted its business away from "legacy" oil and gas services, pressure pumping, and hydraulic fracturing. Green Field's former president testified that he was in charge of operations during the period in question and never diverted Green Field's resources away from its core well services. (Trial Tr. 742-43, 1304-08, 1312-13) [APP 1296, 1760-62]. Defendants point to the Bankruptcy Court's conclusion that the Trustee failed to prove that Green Field ever obtained a cognizable property interest in the PowerGen business opportunity.[21]

The Court agrees with the Trustee that this proposed finding is immaterial. It is undisputed that in late 2012 and early 2013, Moreno began exploring the

---

[21] FFCL 91 [APP 0092] ("Based on the extensive record described above, the Court is unable to conclude that [Green Field] had an interest or expectancy in the potential PowerGen business opportunity.").

possibility of pivoting from fracking services to PowerGen. (FFCL 22-24) [APP 0023-0025]. The only relevance this finding has to the claims is that, at the time that PowerGen could conceivably still have been pursued with Green Field, Moreno continued to honor the requirements of the 2012 SPA. (FFCL 25) [APP 0026]. Once Moreno decided that his only option to pursue the PowerGen business was with GE and outside of Green Field (FFCL 21-22) [APP 0022-23], he repudiated MOR MGH's obligations to Green Field under the SPAs. (FFCL 25-26) [APP 0026-0027]. As the Bankruptcy Court observed, the first breach took place just two days after execution of the Written Consent that waived the PowerGen opportunity and allowed Moreno to pursue it outside of Green Field. (FFCL 25-26, 35) [APP 0026-0027, 0036]. The Bankruptcy Court found this was suggestive of Moreno's malicious intent in causing the breaches of the SPAs. (FFCL 116-17) [APP 0117-0118]. In light of the evidence adduced at trial detailing Moreno's negotiations with GE with respect to Green Field and the potential development of the PowerGen business, Defendants' objection to the Bankruptcy Court's finding that Green Field was transitioning into the power generation market is unpersuasive.

**Objection 5:** **That Moreno Defrauded Goldman Sachs And Diverted $10 Million Earmarked for Green Field to His Personal Use. FFCL 29; Suggestion at 30.**

Defendants object the Bankruptcy Court's finding that "Moreno knowingly and intentionally lied to Goldman Sachs and intentionally diverted $10M earmarked for Green Field to his own personal use." (Objection at 18-30) (citing FFCL 29 [APP 0030]). Defendants argue that (i) no funds were earmarked for Green Field's benefit, and (ii) the Trustee attempted to shift the burden to Moreno to show his use of the borrowings. (Suggestion, 18-19). Although Moreno's own attorney expressly acknowledged that the $10 million in question borrowed by Moreno from Goldman Sachs was to be used to purchase Green Field shares, the loan document itself and Moreno's testimony at trial were more ambiguous. Accordingly, I will sustain Defendants' objection to the finding that the $10 million was "earmarked" for Green Field.

My conclusion, however, is of no consequence. Defendants' assertion that the Bankruptcy Court's "earmarked" finding was the "premise" of the court's ruling on the tortious interference claim (*see* Suggestion at 18) is incorrect. The elements of a tortious interference with contract claim are: (1) the existence of a valid contract, (2) the tortfeasor's knowledge of the contract and intentional interference with it, (3) the resulting breach, and (4) damages. *Hoag v.*

*Chancellor,* 677 N.Y.S.2d 531, 533 (N.Y. App. Div. 1998). Having found in its

summary judgment opinion that the first, third, and fourth elements were met, the

Bankruptcy Court was required to determine after trial only whether Moreno

interfered with MOR MGH and MMR's obligations under the SPAs and whether

he acted with the requisite level of intent. As discussed above, there was ample

evidence from which to conclude that Moreno knowingly caused MOR MGH and

MMR to breach their obligations under the SPAs. *See supra* at 13-18.

The record evidence also established that Moreno intentionally interfered

with MOR MGH's obligations under the SPAs. That Moreno interfered with those

obligations is supported by the following record facts, as summarized by the

Bankruptcy Court:

> Moreno was the manager of MOR MGH. MOR MGH,
> in turn, was owned by two grantor retained annuity trusts,
> collectively referred to as the MGH GRATs. Moreno
> was responsible for managing the assets and investments
> of the MGH GRATs. Accordingly, Moreno exercised
> full control over MOR MGH and controlled whether or
> not it made payments in compliance with its obligations
> under the SPAs. ...
>
> ... Moreno was aware that if he did not cause MOR
> MGH to make its payment [under the 2012 SPA] and
> Moreno did not contribute his one-third share of MMR's
> obligations, then his partners in MMR would likewise not
> follow through with payment ... Moreno did not perform
> and, as a result, caused Moody and Rucks to breach the
> 2012 SPA.

FFCL 114-15.

That Moreno acted with the requisite intent is also evident from the record.

Under New York law, a corporate officer—as opposed to a stranger—must act

with malice in order to be liable for tortious interference with a contract claim. *See*

*Rockland Exposition,* 894 F. Supp. at 336-37. "Malice" can be established by a

showing that the corporate officer acted for personal gain. *Id.* at 338. *See also*

*Petkanas v. Kooyman,* 759 N.Y.S.2d 1, 2 (N.Y. App. Div. 2003). Here, as the

Bankruptcy Court found, there was ample evidence that Moreno acted for personal

gain—at Green Field's expense—in causing the breaches of the SPAs:

> MOR MGH's only asset was its ownership of the
> common shares of Green Field. By causing MOR MGH
> to breach its obligations under the 2012 and 2013 SPAs,
> Moreno deprived Green Field of $17 million of capital
> which Green Field needed in order to satisfy obligations
> to Shell and continue its business.
>
> Further the timing of the breaches of the 2012 SPA
> speaks to Moreno's intent … The first breach of the 2012
> SPA occurred on May 15, 2013, just two days after
> Green Field waived the PowerGen opportunity in favor
> of Moreno personally. In other words Moreno made the
> decision to stop complying with the obligations of the
> 2012 SPA as soon as he knew that he would no longer be
> pursuing the PowerGen business opportunity with Green
> Field. He was thus willing to let Green Field suffer and,
> as he put it, give it the "kiss of death" by denying it
> needed funds and instead putting the money towards a
> business that he now personally owned …
>
> Moreno also knew that MOR MGH breaching the SPAs
> would cause Green Field to fail to make its interest
> payment to Shell, which would cause a cross-default
> under the Bond Indenture, which would then send Green

> Field into a downward spiral towards bankruptcy. ....
> Moreno testified that had the SPAs been fulfilled, Green
> Field would have been able to make the required interest
> payments under the Shell contract....
>
> Moreno falsely testified that "Green Field received every
> dollar that TGS ended up getting." ... [E]ven under
> Moreno's accounting there was at least $35 million on
> hand that he borrowed either personally or through TGS,
> which either went to Moreno personally or was
> unaccounted for.

(FFCL at 116-18).

The Bankruptcy Court found that "[t]he most egregious evidence of

Moreno's malicious intent was his diversion of $10 million from the second

tranche of the Goldman Sachs loan." (FFCL 118; *see* FFCL 29 ("The Court

observes that Moreno initially denied that he used the proceeds to purchase his

residential home in Dallas. However, when confronted with a document from his

real estate planning professionals, he then admitted it.") (citing Trial Tr. 411:24-

420:12; PX 168)); *see also* PX 168 [APP 0874-0876] (email identifying two

options for use of Goldman funds; the first "gets Mike the money used to purchase

the Dallas house;" the second "is distributed to Mike to purchase the Dallas

house.") Although it may be true that the loan agreement did not require that the

$10 million be used exclusively for Green Field stock (it could also be used to

fulfill equipment orders and make an equity investment in TGS), it is undisputed

that the agreement permitted the $10 million to be used to purchase Green Field

stock and that Moreno's attorney and Goldman Sachs understood that the $10 million would be used to purchase Green Field stock. It is also unmistakably clear from the record that Moreno's use of the $10 million to purchase his home violated the express terms of his agreement with Goldman Sachs. (*See* APP 819 ("The Borrowers will not, directly or indirectly, use any part of such proceeds for the purpose of [ ] purchasing, improving, or otherwise investing in residential real estate")). I agree therefore with the Bankruptcy Court's conclusion that "spending available funds on one's personal residence in direct violation of the terms of the loan agreement, rather than fulfilling obligations to the company, constitutes placing one's personal interests ahead of the company's." (FFCL 118). That conclusion justifies the finding that Moreno tortiously interfered with MOR MGH's obligations under the SPAs.

## B. Proposed Conclusions of Law

All five of Defendants' objections to the proposed conclusions of law concern the Bankruptcy Court's imposition of a constructive trust on Moreno's Dallas residence. The Bankruptcy Court applied Delaware law in deciding to impose the constructive trust. "Under Delaware law, 'a constructive trust is an equitable remedy of great flexibility and generality. A constructive trust is proper when a defendant's fraudulent conduct causes him to be unjustly enriched at the expense of another to who he owed some duty.'" (FFCL 120-21 (quoting

*Ruggiero v. Estate of Poppiti*, 2005 WL 517967, at \*3 (Del. Ch. Feb. 23 2005); *In re Opus East, LLC,* 528 B.R. 30, 106 (Bankr. D. Del. 2015) ("The imposition of a constructive trust is also appropriate where a defendant has been unjustly enriched.") "To prevail on a claim for unjust enrichment or imposition of a constructive trust[,] the Trustee must allege sufficient facts to plausibly show that (i) there was an enrichment; (ii) an impoverishment; (iii) a relation between the enrichment and the impoverishment; (iv) the absence of justification; and (v) the absence of a remedy provided by law." (FFCL 121 (citing *In re Direct Response Media, Inc.*, 466 B.R. 626, 661 (Bankr. D. Del. 2012)). The Bankruptcy Court applied this standard to its findings of fact and concluded:

> Moreno was enriched by using $10 million to buy a home, and Green Field was impoverished because it was deprived of $10 million of funding. The impoverishment is directly related to the enrichment, and there is no justification for Moreno's actions. Further, there is no adequate remedy at law to be able to recover the $10 million spend on the home.

(FFCL 123) [APP 0124].

I address Defendants' five objections in turn.

## 1. Choice of Law[22]

Citing the Third Circuit's *Columbia Gas* decision, Defendants argue that "in cases where the application of New York state law would 'warp the definition Congress intended to provide to the exclusion from the bankruptcy estate for equitable interests,' courts should apply the federal common law of constructive trusts." (Suggestion, 32 (quoting *In re Columbia Gas Sys.*, 997 F.2d 1039, 1056 (3d Cir. 1993)). According to Defendants, the Bankruptcy Court applied New York's constructive trust doctrine so broadly that the Trustee was allowed to attach assets that could not have been recovered under any provision in the Bankruptcy Code, and thus, under *Columbia Gas* and its progeny, the Bankruptcy Court's application of New York's constructive trust doctrine was erroneous. (*Id.*) Defendants' argument is perplexing, however, as the FFCL applies Delaware state law in its constructive trust analysis—not New York state law.

To the extent that Defendants argue that the Bankruptcy Court should have applied federal common law[23] because it would have prohibited the Trustee from obtaining a constructive trust, that argument is incorrect. Courts consistently hold

---

[22] Defendants argue that the Bankruptcy Court misapplied the choice of law rules but refer to the discussion contained in the Motion to Amend, which they have since withdrawn. (Suggestion, 31).

[23] Defendants appear to advocate for both Delaware law *and* federal law to apply. (*See* Suggestion, 32)

that the burden of proof on the issue of whether a constructive trust should be imposed is a matter of state, not federal law. *In re Brockway Pressed Metals, Inc.,* 363 B.R. 431, 454 (Bankr. W.D. Pa. 2007), *subsequently aff'd sub nom. In re Brockway Pressed Metal, Inc.,* 304 F. App'x 114 (3d Cir. 2008); *see also In re Washington Mut., Inc.,* 450 B.R. 490, 501 (Bankr. D. Del. 2011) ("[T]he Bankruptcy Code does not preclude the application of constructive trust law."). The Court agrees with Trustee that the *Columbia Gas* case is distinguishable and does not require a different outcome.[24] Additionally, Defendants do not explain how Delaware state law would differ at all from federal common law on this issue, nor do they even articulate what standard would apply under federal law.

### 2. Clear and Convincing Evidence Standard

Defendants argue that a key distinction under Delaware law is that the burden imposed on the plaintiff is the "clear and convincing" standard. (Suggestion, 32-33). Defendants assert that the FFCL did not apply this standard. Trustee argues that the Bankruptcy Court applied Delaware law and found that the Trustee carried his burden. "The clear and convincing standard requires evidence that produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable." *Hudak v. Procek,* 806 A.2d 140, 147

---

[24] In the *Columbia Gas* case, applying state law would have prohibited the court from imposing a constructive trust, which the court found necessary to comply with the relevant federal regulatory scheme. *Columbia Gas,* 997 F.2d at 1056.

(Del. 2002); *Padcom, Inc., v. NetMotion Wireless, Inc.*, 418 F. Supp. 2d 589, 594

(D. Del. 2006) (same). As set forth herein, the Court agrees there was clear and

convincing evidence of each of the elements required for imposition of

constructive trust: that Moreno was enriched because he took $10 million of the

loan proceeds to purchase his home; that Green Field was impoverished because it

was deprived of $10 million of funding taken by Moreno; that the funding taken

from the SPAs was directly related to the Goldman loan; that Moreno was not

justified in taking the money to buy his home instead of causing MOR MGH to

make the $10 million payment required by the 2013 SPA; and that Moreno did not

keep the money in recoverable form, but rather used it to purchase his home and

then recorded a homestead declaration, rendering a money damage award for that

amount inadequate.[25]

### 3. Recognized Cause of Action

Defendants assert that a constructive trust remedy is only available for

"recognized causes of action." Defendants appear to further argue that a tortious

interference with contract claim is not a recognized cause of action in Delaware,

and therefore a constructive trust cannot be imposed as a remedy. (Suggestion, 33-

---

[25] "Texas law gives its citizens an exemption up to 10 acres of real property in an urban area in one or more contiguous tracks, and any improvements thereon, without dollar limitation." *In re Bading*, 376 B.R. 143, 146 (Bankr. W.D. Tex. 2007) (citing Tex. Prop. Code §§ 41.001(a), 41.002(a)).

34). Defendants suggest that the "recognized causes of action" listed in *Teachers Ret. Sys. v. Aidinoff*, 900 A.2d 654, 670-71 (Del. Ch. 2006) is an exhaustive list of the only causes of action capable of giving rise to a constructive trust—namely unjust enrichment, fraud, and breach of fiduciary duty. The Court agrees with Trustee that this argument is simply wrong. In *Teachers*, the court made the point that some type of liability had to be established against a defendant in order to impose a constructive trust; it was not purporting to limit the remedy to specific causes of action. *Id.* As Trustee points out, the claims specifically identified in *Teachers* were all torts—much like the Trustee's *tortious* interference claim for which the Bankruptcy Court granted the constructive trust remedy. Finally, Defendants argue that their review of Delaware case law revealed no published opinions imposing a trust on a contract or tortious interference claim. (*Id.* at 34). However, Trustee cites several decisions wherein Delaware courts have awarded constructive trusts in the context of contract-based claims, and Defendants cite no authority that would preclude it.[26]

## 4. Adequate Remedy at Law and Burden of Proof

Defendants argue that, even if this Court determined that New York law applies to the constructive trust remedy, New York law bars the imposition of a

---

[26] *See e.g., ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *17 (Del. Ch. Mar. 16, 1995); *Grunstein v. Silva*, 2009 WL 4698541, at *7 (Del. Ch. Dec. 8, 2009)).

constructive trust because the Trustee already had an adequate remedy at law in the form of money damages. (Suggestion, 34). Defendants further argue that, under New York law, the party seeking the imposition of a constructive trust has the burden to establish "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." (*Id.* at 36 (citing *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (N.Y. 1976)). Defendants argue that the "absence of any one of the [] elements is fatal to a party's request for imposition of a constructive trust" and, here, not only did the Trustee failed to plead these elements, it is also impossible for him to establish the critical unjust enrichment element. (*Id.* at 36-37 (quoting *Asurion Ins. Servs. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.*), 377 B.R. 478, 483 (Bankr. D. Del. 2007)). Again, the Court finds no reason to disagree with the Bankruptcy Court's conclusion—in line with the parties' apparent positions—that Delaware law applies to the constructive trust remedy. Defendants' arguments under New York law are therefore irrelevant here.

With respect to the Bankruptcy Court's holding that "there is no adequate remedy at law to be able to recover the $10 million spent on the home" (FFCL 123), it is important to note that the Bankruptcy Court's imposition is in the alternative to, rather than cumulative of, the money damage award under the Trustee's tortious interference claim. Accordingly, if Moreno satisfies the judgment against him on the Trustee's contract claims, then the constructive trust

would be rendered moot. The Trustee correctly argues that the existence of an alternative remedy in the form of money damages is not automatically deemed "adequate." *See e.g., Frederickson v. Blumenthal*, 648 N.E.2d 1060, 1062 (Ill. App. Ct. 1995) ("The question to be determined is whether the remedy at law compares favorably with the remedy afforded by the equity court.") Here, Moreno expressly admitted that he spent the specific $10 million due to Green Field under the 2013 SPA specifically on his Dallas residence (and then recorded a homestead declaration), which is corroborated by documentary evidence. In light of this evidence, applicable case law supports the alternative relief recommended by the Bankruptcy Court.

### 5. Burden to Trace

Finally, Defendants argue that the Trustee failed to satisfy his burden to trace the funds to Moreno's Dallas home as (i) the record is insufficient to support conclusions that the loan proceeds were "earmarked" under the standards set forth by the Third Circuit in *Winstar*, and (ii) there is no "direct evidence" that Moreno used these loan proceeds to purchase his Dallas home. The Court has already rejected Defendants' argument that the Bankruptcy Court's conclusion that Moreno tortiously interfered with a contract claim was premised on the court's "earmarking" finding. The Court also agrees with Trustee that Moreno's direct

testimony was sufficient to establish that he used the loan proceeds to purchase his Dallas home:

> Q. Okay. And so, and that second tranche was supposed to be the source of the funding for the 2013 SPA purchase, right?
>
> A. The loan had the ability for me to invest in Green Field, Shale Support Services and anything related to those companies. It also had the ability for me to pay back any advances in loans that I had made to Green Field or any of the entities.
>
> And so what simply happened here, Jim, is the second tranche, I elected to repay myself loans that I had made, and used then [sic] for the purchase of a home in Dallas.

(Trial Tr. 416:4-19) [APP-1126]. This testimony is corroborated elsewhere in the record.[27] Defendant's admission that he used the loan proceeds to purchase his home is sufficient to satisfy the burden, if any, to "trace" those funds to his home.

## V. CONCLUSION

For the foregoing reasons, the Court sustains Defendants' objection to the Bankruptcy Court's factual finding that the $10 million Moreno diverted to his personal use was "earmarked" for Green Field, overrules Defendants' remaining Objections, and adopts the Bankruptcy Court's proposed FFCL. The Court will issue a separate Order consistent with this Memorandum Opinion.

---

[27] *See* PX 168 [APP 0874-0876] (email identifying two options for use of Goldman funds; the first "gets Mike the money used to purchase the Dallas house;" the second "is distributed to Mike to purchase the Dallas house.").